**Oral Argument Not Yet Scheduled**

No. 15-3045
_____

IN THE
**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**UNITED STATES OF AMERICA,**

*Appellee,*

v.

**BRIANNA MEADOWS,**

*Appellant.*
_____

**On Appeal from the United States District Court
for the District of Columbia**
_____

**BRIEF FOR APPELLANT**
_____

**Charles B. Wayne
Jerald R. Hess
DLA PIPER LLP (US)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com
j.hess@dlapiper.com**

*Counsel for Appellant
(Appointed by this Court)*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

### A. Parties and Amici

This appeal arises from a criminal prosecution of Brianna Meadows by the United States of America.  There are no intervenors or amici.

### B. Rulings Under Review

Appellant Meadows seeks review of the following rulings of the district court (the Honorable Amy Berman Jackson):

- denying Meadows' motion to dismiss the indictment as the product of vindictive prosecution (Appendix for Appellant ("App.") 189-90);

- allowing the government, during Meadows' cross-examination, to refer to the district court's denial of Meadows' motion to dismiss (12/18/14 Tr. 160-61, 164-65[1]);

- allowing the government to make an improper closing argument based on mathematical probability ( 12/22/14 Tr. 78-81).

### C. Related Cases

This case has not previously been before this Court.  There are no related cases.

---

[1] The trial transcript is not consecutively paginated, and all trial and other transcripts are referred to by date.  All referenced pages are contained in the Appendix.

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............i

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY ...........................................................................................vi

JURISDICTION .......................................................................................1

STATUTES AND RULES .........................................................................1

ISSUES PRESENTED ..............................................................................1

STATEMENT OF THE CASE ...................................................................2

    A. Proceedings and Disposition Below ...................................................2

    B. Meadows' History with the U.S. Attorney's Office .........................3

        1. Obstruction of Justice Charges ...................................................3

        2. Prison Contraband Investigation .................................................5

        3. Plea Offers ...................................................................................7

    C. Unemployment Benefits ....................................................................8

    D. Pretrial Proceedings ..........................................................................9

    E. Trial ...................................................................................................12

        1. The Alleged Conduct and Meadows' Defense ..........................12

        2. Prosecutor's Reference to Denial of Motion to Dismiss..........14

        3. Verdict ........................................................................................16

    F. Sentencing........................................................................................16

SUMMARY OF ARGUMENT ................................................................17

ARGUMENT ..........................................................................................19

I. THE DISTRICT COURT ERRED IN DENYING MEADOWS' MOTION TO DISMISS THE INDICTMENT AS THE PRODUCT OF VINDICTIVE PROSECUTION. ....................19

   A. The Legal Standard .................................................................19

   B. The District Court's Decision ...............................................21

      1. Erroneous Assumption that the Failed Plea Negotiations and the Resulting Prosecution Were Routine .......................................21

      2. Erroneous Rationale Based on Chronology ...........................24

      3. Erroneous Conclusion that Meadows Did Not Suffer Disparate Treatment ...............................................................26

      4. Erroneous Conclusion that the Government Adduced Sufficient Evidence to Rebut the Presumption .......................................29

II. THE PROSECUTOR IMPROPERLY REFERENCED THE DISTRICT COURT'S DENIAL OF MEADOWS' MOTION TO DISMISS. ......................................30

III. BY ARGUING THAT MEADOWS' DEFENSE HAD A "ONE IN NEARLY 60 MILLION" CHANCE OF BEING TRUE, THE PROSECUTOR MADE AN IMPROPER CLOSING ARGUMENT THAT PREJUDICED MEADOWS AND AFFECTED THE TRIAL'S OUTCOME. ...........................................................33

   A. The Government's "One in Nearly 60 Million" Closing Argument Contained Three Separate Errors ...............................................34

      1. The Probability Argument Assumed Facts Not in Evidence. ................39

      2. The Probability Argument Relied on Statistical Probabilities that Were Never Offered Through Expert Testimony. ...............................41

      3. The Probability Argument Erroneously Equated Proof Beyond Reasonable Doubt with a Numerical Probability of Guilt. ....................42

   B. Each of These Errors Prejudiced Meadows and Affected the Trial's Outcome ...............................................................44

CONCLUSION ...............................................................46

ADDENDUM ...............................................................A-1

## TABLE OF AUTHORITIES

**Pages**

CASES

*Berger v. United States*, 295 U.S. 78 (1935) ..........................................................33

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978)..........................................................25

*Bruton v. United States*, 391 U.S. 123 (1968) ..........................................................32

*Commonwealth v. Ferreira*, 955 N.E.2d 898 (Mass. 2011) ..........37, 40, 41, 42, 43

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ..........................41, 42

*Ex parte Tomlin*, 540 So. 2d 668 (Ala. 1988) (per curiam)....................................30

*Kotteakos v. United States*, 328 U.S. 750 (1946) ....................................................46

*Krim v. pcOrder.com Inc.*, 402 F.3d 489 (5th Cir. 2005)........................................43

*Krulewitch v. United States*, 336 U.S. 440 (1949)...................................................32

*Maddox v. Elzie*, 238 F.3d 437 (D.C. Cir. 2001)..............................................25, 26

*Martin v. Commonwealth*, 75 S.W.2d 13 (Ky. Ct. App. 1934) ...............................30

*Nash v. United States*, 54 F.2d 1006 (2d Cir. 1932)................................................32

*Sailors v. State*, 593 N.E.2d 202 (Ind. Ct. App. 1992) ...........................................30

*State v. Rudd*, 586 S.E.2d 153 (S.C. Ct. App. 2003) .........................................30, 31

*Tagatz v. Marquette Univ.*, 681 F. Supp. 1344 (E.D. Wis. 1988) ...........................41

*United States v. Becton,* 601 F.3d 588 (D.C. Cir. 2010) .........................................44

*United States v. Daniels*, 770 F.2d 1111 (D.C. Cir. 1985) ......................................32

*United States v. Gartmon*, 146 F.3d 1015 (D.C. Cir. 1998) ....................................34

*United States v. Gary*, 291 F.3d 30 (D.C. Cir. 2002) ..............................................21

---

\* Authorities on which appellant principally relies are marked with an asterisk.

iv

*United States v. Linares*, 367 F.3d 941 (D.C. Cir. 2004) ......................................46

*United States v. Maddox*, 156 F.3d 1280 (D.C. Cir. 1998) ..................................33

*United States v. McGinnis*, 2007 WL 1725687 (N-M. Ct. Crim. App. 2007).........43

*United States v. Meyer*, 810 F.2d 1242 (D.C. Cir. 1987) ....... 19, 20, 21, 24, 25, 26

*United States v. Safavian*, 649 F.3d 688 (D.C. Cir. 2011) (per curiam)..........20, 23

*United States v. Sawyer*, 443 F.2d 712 (D.C. Cir. 1971)......................................33

## STATUTES

18 U.S.C.

    § 201.................................................................................................................6

    § 641.......................................................................................................2, 8, 16

    § 1343.....................................................................................................2, 8, 16

22 D.C. Code

    §§ 3211....................................................................................................2, 8, 16

    §§ 3212(a) ..............................................................................................2, 8, 16

## CONSTITUTIONAL PROVISIONS

United States Const. Amend. V ...................................................................18, 22, 29

United States Const. Amend. VI..................................................................18, 22, 29

## OTHER AUTHORITY

Laurence H. Tribe, *Trial By Mathematics: Precision and Ritual in the Legal
    Process*, 84 Harv. L. Rev. 1329 (1971) .............................................................43

# GLOSSARY

DOES            District of Columbia Department of Employment Services

FBI             Federal Bureau of Investigation

FDA             Food and Drug Administration

## JURISDICTION

The Court has jurisdiction of this appeal under 28 U.S.C. § 1291, 18 U.S.C. § 3742(a), and Federal Rules of Appellate Procedure 3 and 4. The district court imposed sentence on Meadows on July 16, 2015, and judgment was entered on the same day. App. 201-06. Meadows filed a timely notice of appeal on July 20, 2015. App. 207-08.

## STATUTES AND RULES

Pertinent statutes and rules are set forth in the addendum.

## ISSUES PRESENTED

1. Whether the district court erred in denying Meadows' motion to dismiss the indictment as the product of vindictive prosecution where

    a. the court ignored the long, involved history of Meadows with the U.S. Attorney's Office and her "unexpected and burdensome assertions of legal rights";

    b. the court erroneously held that because Meadows' assertions of her constitutional rights occurred in cases in which others had been convicted, the prosecutorial vindictiveness doctrine was unavailable;

    c. the court erroneously concluded that Meadows did not suffer disparate treatment even though the U.S. Attorney's office declined to prosecute in every other unemployment benefits case referred to it in the four years prior to Meadows' indictment; and

    d. the court erroneously concluded that the government adduced sufficient evidence to rebut the presumption of vindictive prosecution.

2.  Whether the prosecutor improperly referenced the district court's denial of Meadows' motion to dismiss during cross-examination and did so in a manner that could not be cured by the district court's instruction to the jury.

3.  Whether the prosecutor's closing argument based on mathematical probabilities deprived Meadows of a fair trial where the argument

 a.  assumed facts not in evidence;

 b.  relied on statistical probabilities that were never offered through expert testimony; and

 c.  equated the proof-beyond-a-reasonable-doubt standard with a numerical probability of guilt.

### STATEMENT OF THE CASE

**A. Proceedings and Disposition Below**

On March 27, 2014, the government obtained a six-count indictment against Brianna Meadows for falsely obtaining unemployment benefits from the District of Columbia Department of Employment Services during the period of May 2009 through April 2010.  The charges included four counts of wire fraud in violation of 18 U.S.C. § 1343; one count of theft of government money in violation of 18 U.S.C. § 641; and one count of first degree theft in violation of D.C. Code §§ 22-3211 and 22-3212(a).  App. 25-27.

Trial was held in December 2014, and the jury found Meadows guilty on each count.  12/22/14 Tr. 126-27.  On July 16, 2015, the district court sentenced Meadows to 36 months of probation on each count, all sentences to run

2

concurrently.   App. 203.   One of the conditions of probation was intermittent confinement:   120 days in the D.C. Jail, to be served on consecutive weekends. App. 204.  Meadows has completed the confinement portion of her sentence.  The sentence also included 200 hours of community service under the supervision of the U.S. Probation Office, *id.*, which has also been completed.  App. 209.

### B. Meadows' History with the U.S. Attorney's Office

#### 1. Obstruction of Justice Charges

In the first half of 2008, the United States Attorney's Office for the District of Columbia was investigating Meadows' then-boyfriend – Pedro Petrovic – for homicide.   App. 175.   The government pressured her to cooperate in the investigation, but she repeatedly declined.  *Id.*  The government then claimed that Meadows provided false information concerning Petrovic's whereabouts and had intentionally deleted his contact information from her cell phone.  App. 30, 175.

Meadows was arrested in June 2008 and charged in D.C. Superior Court with obstruction of justice.  App. 175.  Although Meadows had no prior criminal record, the government sought preventive detention at her presentment.  App. 30, 45.  She was held at the D.C. Jail until her preliminary hearing, when she was released on the condition that she have no contact with Petrovic.  App. 30, 45.  The government continued to pressure her to cooperate, but she refused, exercising her constitutional right to remain silent.   App. 31, 175.   Her refusal to cooperate

3

continued until Petrovic's arrest in December 2008 on local charges that included first degree murder.  App. 31.

Despite Meadows' continuing refusal to cooperate, the government did not obtain an indictment against her and was forced to dismiss the obstruction of justice charges in March 2009, nine months after her arrest.  App. 31, 44, 175.  As for Petrovic, the government obtained an indictment in July 2009 that charged him with first degree murder and two firearms offenses.  App. 31.  Petrovic's trial in Superior Court was scheduled to begin on April 12, 2010.  App. 50.

The government then turned its attention back to Meadows and her continuing refusal to assist in Petrovic's prosecution.   One year after the obstruction of justice charges had been dismissed and one month before Petrovic's April 12 trial date, the government (1) obtained a Superior Court indictment against Meadows, charging her with the previously-dismissed obstruction charges and one count of being an accessory after the fact (App. 31, 175); and (2) moved to join Meadows' trial with Petrovic's trial.  App. 31, 44.  This maneuver did not have the desired effect, as Meadows' position on cooperation did not change.  The government withdrew its joinder motion one week before the start of Petrovic's trial.  App. 31, 43.

The jury found Petrovic guilty on all charges, and the court sentenced him to 35 years in prison for the murder and an additional six consecutive years for the

firearms offenses.  App. 32.  The government continued to pursue its obstruction case against Meadows, and the court set a trial date of January 24, 2011.  App. 43. After significant pretrial motion practice, the government dismissed the entire case on what would have been the first day of trial.  App. 42-43.

### 2.  Prison Contraband Investigation

In March 2011, the Federal Bureau of Investigation began an investigation called "Concrete Playground."  Its purpose was to identify and prosecute the corrections officers who were bringing contraband to D.C. Jail inmates in exchange for payment.  App. 176.  The government alleged that both Petrovic and Meadows were involved in the contraband scheme.  In particular, the government asserted that Meadows met with undercover FBI agents on five occasions during April and May 2011 in order to arrange deliveries of contraband to Petrovic.  *Id.*

The lead counsel in the Concrete Playground investigation was Assistant United States Attorney Seth Waxman, who was also lead counsel in the prosecution that is the subject of this appeal.  *Id.*  In January 2012, Waxman learned that officials at the D.C. Jail (1) wanted the U.S. Attorney's Office to arrest and prosecute Petrovic for introduction of contraband unrelated to the Concrete Playground investigation; and (2) told the supervising AUSA for Superior Court, Jocelyn Ballantine, that "Meadows may have assisted in getting the contraband into the jail by posing as an investigator from the [Maryland] Public Defender's

Office." App. 78. Ballantine asked Waxman if he had any interest in pursuing the case against Petrovic and/or Meadows. *Id.* Waxman did not, and told Ballantine "to take whatever action she deemed appropriate in Superior Court." *Id.* The U.S. Attorney's Office brought charges against Petrovic in Superior Court for introduction of contraband, but did not prosecute Meadows. App. 176.

During the course of the Concrete Playground investigation, the FBI approached Meadows in an effort to secure her cooperation, but she declined to speak to them. App. 78. In late June 2012, Waxman sent Meadows, through her counsel, (1) a target letter; and (2) a grand jury subpoena. App. 105-07. The target letter stated that the FBI, "in conjunction with the United States Attorney's Office for the District of Columbia, have been conducting an investigation which shows that you may have committed violations of the federal criminal code, including violations involving bribery, in violation of 18 U.S.C. § 201." App. 105. The letter also stated a meeting had been scheduled to give Meadows "an opportunity to discuss this matter" before the U.S. Attorney's Office decided "whether to bring formal criminal charges." *Id.*

Waxman has acknowledged that his "primary intent in serving Meadows in the grand jury subpoena and target letter was to gain her cooperation against the [corrections officers] she worked with to smuggle contraband into the D.C. Jail . . . ." App. 78-79. Meadows declined to meet with Waxman or cooperate in any

6

way with the Concrete Playground investigation or the contraband prosecution against Petrovic in Superior Court.  App. 177.  Petrovic eventually pled guilty to the contraband charges.  App. 178.  Meadows was never charged.  *Id.*

### 3. Plea Offers

In March 2013, the government, through Waxman, made the first of two formal plea offers to Meadows.  The proposed agreement required her to plead guilty to (a) one misdemeanor count of introduction of contraband into the D.C. Jail; and (b) one count of wire fraud – a felony – for falsely obtaining unemployment benefits from the D.C. Department of Employment Services (discussed below).  The offer did not require Meadows to cooperate with the government in any other prosecution.  App. 135-56, 177.  Meadows rejected that offer.  App. 177.

Three months later, the government, again through Waxman, made a more favorable plea offer, once more not conditioned on Meadows' cooperation with any other prosecution.   Meadows would have had to plead guilty to two misdemeanors, one for the contraband and one for the unemployment benefits App. 157-73, 177-78.  Meadows rejected that offer as well.  App. 178.

The government never prosecuted Meadows for obstruction of justice, bribery of a corrections officer, or introduction of contraband into the D.C. Jail.

7

### C. Unemployment Benefits

In February 2011, Meadows received a letter from the D.C. Department of Employment Services ("DOES") stating that she was being audited for possible overpayment of unemployment benefits that she received in 2009. App. 175-76. DOES alleged that Meadows filed claims for such benefits in 2009 and 2010, even though she was employed at the time. DOES referred the matter for possible criminal prosecution in March 2011, but no criminal charges were pursued at that time. App. 176.

Over the next three years, DOES recouped $6,220 of the $14,173 overpayment through refunds that Meadows was due on her District of Columbia taxes. App. 178-79, 191. Three days after $2,506 had been recouped on March 24, 2014, App. 191, the U.S. Attorney's Office obtained a six-count felony indictment based on the overpayment: four counts of wire fraud in violation of 18 U.S.C. § 1343; one count of theft of government money in violation of 18 U.S.C. § 641; and one count of first degree theft in violation of D.C. Code §§ 22-3211 and 22-3212(a). App. 21-29. Although Meadows' counsel had informed the government in the spring of 2013 that Meadows would voluntarily appear for her arraignment if she were prosecuted, the government chose to arrest Meadows rather than contact her counsel. App. 178.

8

### D. Pretrial Proceedings

In July 2014, Meadows moved to dismiss the indictment. The basis for her motion was the doctrine of vindictive prosecution, which prohibits retaliation against a criminal suspect or defendant for the exercise of a constitutional or statutory right. The motion was fully briefed,[2] and a hearing was held.

Meadows argued in her papers and at the hearing that the U.S. Attorney's Office was prosecuting her for an offense that is rarely prosecuted in the District of Columbia – wrongfully obtaining unemployment benefits – and was doing so with a vindictive motive: to punish her for (1) repeatedly refusing to cooperate in the homicide investigation of her boyfriend, Petrovic; (2) allegedly hampering that investigation and engaging in conduct that constituted obstruction of justice, a charge that the U.S. Attorney's Office twice brought against her, but dismissed both times; (3) allegedly participating in the D.C. Jail contraband scheme that was the object of the Concrete Playground investigation by bribing a corrections officer; (4) refusing to cooperate in the Concrete Playground investigation; (5) allegedly posing as an investigator from the Maryland Public Defender's Office in order to get contraband to Petrovic in the D.C. Jail; and (6) refusing two plea offers that the U.S. Attorney's office plainly believed to be very generous. App. 30-33, 36-40.

---

[2] App. 30-72; App. 73-107; App. 108-14; App. 133-73.

At the hearing, Meadows introduced three exhibits: two summary exhibits[3] and the underlying documents that related to 117 cases from 2011 to 2014 in which individuals were accused of fraudulently obtaining unemployment benefits from DOES and civil recoupment proceedings were initiated. 8/12/14 Tr. 7-8. Of those 117 cases, the DOES Inspector General referred 41[4] to the U.S. Attorney's Office for prosecution because the amount in issue exceeded DOES's informal threshold of $15,000.[5] The U.S. Attorney's Office declined to prosecute in each of the 41 cases. App. 116-23. The district court believed this evidence to be "compelling." 8/12/14 Tr. 11.

AUSA Waxman – the lead prosecutor in the Concrete Playground investigation and the lead prosecutor in Meadows' unemployment benefits case – emphasized at the motions hearing that the prosecution was merely the product of a failed "routine, run-of-the-mill plea negotiation." *Id.* at 23. Waxman also had the following colloquy with the district judge:

> [MR. WAXMAN:] When she rejected that plea offer, the government sat back -- myself and my supervisors -- and said, Well, the concrete playground investigation is done, the targets of that investigation, the key targets, the people that investigation was designed to address, have either been found guilty or plead guilty. We have just

---

[3] App. 115-32.

[4] App. 184 n.5.

[5] App. 37-38.

one person -- Ms. Meadows -- who's still hanging out there. What do we do?

Well, she's engaged in this unemployment fraud scheme. She met with an undercover FBI agent on five occasions, used a false public defender's identification to gain access to the DC jail. We can't just walk away from that. That is --

THE COURT: Okay. So why do you not charge her with that?

MR. WAXMAN: We may. That case is still active. We decided -- so we have two separate investigations. And when we made this charging decision it had nothing to do with Ms. Meadows's decision to cooperate or not cooperate. . . .

*Id.* at 22.

The district judge denied the motion to dismiss in a memorandum opinion and order in which she concluded that (1) Meadows had not demonstrated actual vindictiveness[6] nor a presumption of vindictiveness[7]; and (2) even if a presumption of vindictiveness were assumed, the government "provide[d] a legitimate, nonvindictive explanation" for the prosecution, and Meadows "has not submitted evidence that rebuts that justification."[8]

---

[6] App. 180.

[7] App. 181-87.

[8] App. 189.

### E. Trial

#### 1. The Alleged Conduct and Meadows' Defense

DOES administers the District of Columbia's unemployment benefits program, which is funded in part by DOES and in part by the federal government. 12/17/14 Tr. 16-18. The government sought to prove that, from May 2009 through September 2010, Meadows unlawfully received unemployment benefits in the amount of $14,173 while employed full-time. 12/17/14 Tr. 102-03, 108. Specifically, the government sought to prove that Meadows had obtained these funds by electronically certifying, on 49 separate occasions, that she was unemployed and entitled to such benefits. *Id.* at 39-41.

Meadows testified that she possessed a good faith belief that she was entitled to the benefits until DOES notified her otherwise. 12/18/14 Tr. 101. She testified as follows:

- Meadows first applied for benefits on April 19 or 20, 2009 after she lost her job and was unemployed. 12/18/14 Tr. 86.

- On April 22, she was contacted by a temporary employment agency and was told that they could place her in a job at the Food and Drug Administration to cover for an employee on a six-week maternity leave. She began that job on April 27. *Id.* at 87, 93.

- After the temporary agency notified Meadows about the job, she spoke with DOES and asked how this temporary job would affect her claim for unemployment benefits. *Id.* at 87-88. She was told

12

that she could still file the required weekly online claim form with DOES so long as she disclosed the wages that she earned. *Id.* at 88.

- The first question on the online claim form was: "Were you able, available, and actively seeking work during the week claimed?" Meadows answered "yes" because (1) she was still actively looking for a permanent full-time position and (2) she understood from her DOES case manager that she was still eligible for benefits because she worked for a temporary agency and had a temporary position. *Id.* at 89-90.

- The second question on the form asked for the amount of gross earnings, if any, that week. For the weeks that she was working at the FDA, she "put in the weekly wages that [she] earned." *Id.* at 90.

- Meadows answered "no" to questions 3, 4, and 5, which related to severance pay, changes in a pension, and whether she refused work or was fired. *Id.* at 90-91.

- The sixth and final question on the online form was: "Did you return to work full-time?" Meadows answered "no." *Id.* at 91.

- Meadows' six-week job at the FDA was extended, and she worked there as an employee of the temporary agency until September 2010. *Id.* at 93.

- Meadows completed the online form the same way each week. She does not know how computers work and cannot explain why her wages did not appear on her answer to the second question other than a computer "glitch" or mistake. *Id.* at 112-13.

- Meadows declared both her wages and the unemployment benefits as income on her 2009 tax return. *Id.* at 93-94.

13

- Meadows received an audit notice from DOES in February 2011 and another notice one month later stating that she had been overpaid $14,173. *Id.* at 94, 96, 97. She called DOES and was told that she was required to reduce the amount owed to $6,000 before DOES would approve a repayment schedule. *Id.* at 96. She was informed that DOES would begin recouping the money by taking her tax refund if she could not make the required payment. *Id.* at 96-97. She did not have the money to bring the balance down to the $6,000 threshold. *Id.* at 97.

- DOES recouped a total of $6,220 from Meadows tax funds from 2012 through 2014. *Id.* at 97-100; App. 191.

- After Meadows was arrested in March 2014 and charged with fraud, she called DOES to see if she could begin making payments. She was told that the threshold had been raised to $10,000. 12/18/14 Tr. 100. Her balance was below $10,000, and she made three payments during the remainder of 2014 totaling $7,953, which was the total amount owed. *Id.* at 100-01; App. 191.

## 2. Prosecutor's Reference to Denial of Motion to Dismiss

During the prosecutor's cross-examination of Meadows concerning the timing of the payments that she made to DOES, he asked the following series of questions:

> Q.     And, in fact, in the summer of 2014, in August of 2014, you, through your lawyer, filed a motion to dismiss this case, isn't that right?
>
> A.     Yes.
>
> Q.     And the judge denied that motion, isn't that right?

14

> A.     Yes.
>
> Q.     And, in fact, there were two such motions, is that correct?
>
> A.     I don't know.
>
> Q.     One had to do with Count 5?

12/18/14 Tr. 132.  At this point, defense counsel objected and the district court instructed the prosecutor not to mention what the motions to dismiss "had to do with" because "[t]hat's all legal matters." *Id.*  The prosecutor then continued with similar questions:

> Q.     You don't recall two separate motions to dismiss?
>
> A.     I don't know what my lawyer -- I just know there was a motion.
>
> Q.     To dismiss?
>
> A.     Yes.
>
> Q.     Okay.   And you understood the court, Judge Jackson, denied that motion?
>
> A.     Yes.

*Id.* at 132-33.  A few minutes later, the prosecutor again referenced the district court's denial of Meadows' motion to dismiss: "[I]t's your testimony that your failure to make payments had everything to do with the threshold balance and not the stages of this litigation and your failure to win the motion to dismiss?  That's your testimony?" *Id.* at 146.

15

After Meadows finished testifying, defense counsel requested a curative jury instruction, arguing that by referencing the fact that the district court denied the motion to dismiss, the prosecutor created "the possibility that it had something to do with guilt or innocence." *Id.* at 161. The district court gave the following instruction to the jury:

> [D]uring the cross-examination of Miss Meadows you heard testimony about a motion to dismiss that was submitted to me and my ruling on that motion to dismiss. I want to instruct you, and you are instructed, that the motion related to a legal question and I ruled on that legal question and that legal question only.
>
> My ruling had nothing to do with the guilt or innocence of Miss Meadows or the merits of the case; that is the matter that is being submitted to you. So, you should draw no inferences one way or the other with respect to the questions that you have to consider that I denied a motion to dismiss on some other legal question.

*Id.* at 164-65.

### 3. Verdict

The jury returned a guilty verdict on all six counts of the indictment: four counts of wire fraud (18 U.S.C. § 1343); one count of theft of government money (18 U.S.C. § 641); and one count of first degree theft (D.C. Code §§ 22-3211 and 22-3212 (a)). 12/22/14 Tr. 126-27.

### F. Sentencing

The government, in both its sentencing memorandum and at the sentencing hearing, focused more on conduct for which Meadows was never charged or

16

prosecuted to conclusion than it did on the conduct for which she was convicted. The government urged the court to impose a sentence of 18 months incarceration because of Meadows' alleged "lies to government officials that goes back years and in virtually every legal context one could think of," *i.e.*, "lying to Metropolitan Police Department officers in a homicide case" and obstructing justice; "meet[ing] with an undercover FBI agent on five occasions" during the Concrete Playground investigation; and "claiming to be working on behalf of the Maryland public defender service" in order to pass contraband to her boyfriend in the D.C. Jail. 7/16/15 Tr. 16, 17, 20;  App. 193-95, 195-97.

The district court sentenced Meadows to concurrent sentences of 36 months of probation on each count.  The conditions of probation included (1) intermittent confinement of 120 days in the D.C. Jail, to be served on consecutive weekends; and (2) 200 hours of community service.  App. 203-04.  Meadows has completed both the confinement and the community service.

## SUMMARY OF ARGUMENT

As a threshold matter, the district court committed clear error when it denied Meadows' motion to dismiss the indictment as a product of prosecutorial vindictiveness.  Contrary to the court's conclusion, Meadows proved prosecutorial vindictiveness by adducing evidence sufficient to establish a presumption that the government retaliated for her "unexpected and burdensome assertions of legal

rights," *i.e.*, the exercise of her Fifth Amendment rights to due process and against self-incrimination, and her Sixth Amendment right to jury trial. Because of her exercise of these rights, the government subjected her to unlawful disparate treatment by obtaining a six-count felony indictment for wrongfully obtaining unemployment benefits, an offense rarely prosecuted and that the U.S. Attorney's Office had entirely declined to prosecute during the four years prior to the indictment. The evidence showed that the prosecutor had a "personal stake" in the matter and "a motivation to engage in self-vindication."

The district court's denial of the motion was also erroneous in that its opinion improperly concluded that (1) the government's charging decision was required to "chill" Meadows future exercise of her constitutional rights, as opposed to punishing the prior exercise of those rights; (2) the government could take into account Meadows' exercise of her constitutional rights – refusing to cooperate and/or plead guilty – in making its charging decision; and (3) the government had introduced evidence sufficient to rebut the presumption of vindictiveness created by Meadows' evidence.

In its conduct of the trial, the district court erred in allowing the government to repeatedly reference the court's denial of the vindictiveness motion during the cross-examination of Meadows. References at trial to such preliminary determinations are improper and prejudicial because they pose the danger,

particularly in this case, that a juror may understand the reference to mean that the judge believes the defendant to be guilty or, at a minimum, believes the government's version of events.  No jury instruction, including the one given below, can cure this prejudice.

Finally, the district court erred in allowing the government's closing argument based on mathematical probability, *i.e.*, that Meadows' computer-error defense had a "one in nearly 60 million" chance of being true.  This argument was improper and highly prejudicial because it (1) assumed facts not in evidence; (2) relied on statistical probabilies that were never offered through expert testimony; and (3) equated the proof-beyond-a-reasonable-doubt standard with a numerical probability of guilt, impermissibly redefining the standard.

## ARGUMENT

### I.  THE DISTRICT COURT ERRED IN DENYING MEADOWS' MOTION TO DISMISS THE INDICTMENT AS THE PRODUCT OF VINDICTIVE PROSECUTION.

#### A. The Legal Standard

The doctrine of prosecutorial vindictiveness "refers to a situation in which the government acts against a defendant in response to the defendant's prior exercise of constitutional or statutory rights."  *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987).  "A defendant may prove prosecutorial vindictiveness by submitting either (i) evidence of the prosecutor's actual vindictiveness or (ii) evidence sufficient to establish a 'realistic likelihood of vindictiveness,'

19

thereby raising a presumption the Government must rebut with objective evidence justifying its action." *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (per curiam) (quoting *Meyer*, 810 F.2d at 1245). The "showing [of actual vindictiveness] is, of course, exceedingly difficult to make." *Meyer*, 810 F.2d at 1245.

As to the second option, a defendant can obtain "the benefit of the presumption . . . [by] show[ing] the prosecutor's action was 'more likely than not' attributable to vindictiveness." *Safavian*, 649 F.3d at 692 (citations omitted). This Court has held that "in the pretrial context" a prosecutor's "decision to increase charges after a defendant has exercised a legal right does not alone give rise to a presumption" of vindictiveness, "but it is surely a fact relevant to the analysis." *Id.* (citations and internal quotation marks omitted).

This Court has also recognized the human dynamic that is central to the doctrine. The government cannot avoid the presumption of vindictiveness simply by asserting that two different individuals were involved in the disparate charging decisions; rather, it is "the conduct of the government as a whole" that is relevant. *Meyer*, 810 F.2d at 1247-48. Correspondingly, "[i]t is also a fundamental assumption of the doctrine . . . that a prosecutor, like a judge, being but human may have a personal stake . . . and a motivation to engage in self-vindication." *Safavian*, 649 F.3d at 692 (citations and internal quotation marks omitted).

20

In short, the "critical question" is whether a defendant has "shown that all of the circumstances, when taken together, support a realistic likelihood of vindictiveness and therefore give rise to a presumption." *Meyer*, 810 F.2d at 1246. The *Meyer* decision identified three such circumstances:  (1) "the government's disparate treatment" of defendants who exercised a constitutional or statutory right as opposed to those who did not – "[p]erhaps the most important of the circumstances peculiar to this case"; (2) whether the charging decision was made prior to gaining "full knowledge or appreciation of the facts"; and (3) whether the case involved "run-of-the-mill," "routine[ ]" invocations of procedural rights that would be unlikely to engender vindictiveness or "unexpected and burdensome assertions of legal rights" that would support a presumption of vindictiveness. *Id.* at 1246-47.

## B. The District Court's Decision

This Court reviews a finding regarding prosecutorial vindictiveness for clear error. *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002).  The district court's decision was clearly erroneous for the reasons set forth below.

### 1. Erroneous Assumption that the Failed Plea Negotiations and the Resulting Prosecution Were Routine

A fundamental assumption running throughout the district court's memorandum opinion is that the failed plea negotiations and the resulting prosecution were routine:  the government made plea offers, and Meadows rejected

21

them and took her chances. *See, e.g.,* App. 183, 185-86. But this assumption is erroneous, for it ignores the long, involved history of Meadows with the U.S. Attorney's Office, which was inextricably intertwined with the decision to prosecute.

Any rational view of the evidence presented below yields the conclusion that Meadows was a thorn in the government's side because she repeatedly insisted on her Fifth Amendment rights to due process and to remain silent, and her Sixth Amendment right to a jury trial:

- She repeatedly refused to cooperate in the homicide investigation of her boyfriend and, according to the government, hampered that investigation and obstructed justice;

- She – according to the government – bribed a corrections officer in connection with the Concrete Playground investigation and, when confronted, refused to cooperate in that investigation; and

- She allegedly smuggled contraband to her boyfriend in the D.C. Jail while posing as an investigator for a Public Defender's Office and refused to cooperate in his prosecution for that offense.

At the motions hearing, when the prosecutor recounted the repeated refusals to cooperate and the alleged conduct, the judge asked precisely the right question: "So why do you not charge her with that?" 8/12/14 Tr. 22. The prosecutor had no good answer, saying only, "We may." *Id.* Whatever the reason for the government's failure to prosecute – whether inattention, inertia, or the press of

other matters – it is nevertheless clear that Meadows was a piece of unfinished business for the U.S. Attorney's Office in general and AUSA Waxman in particular. In a moment of candor, he told the court that Meadows was a bad actor, the only one "who's still hanging out there," and one that "[w]e can't just walk away from . . . ." *Id.*

Despite that view, the government, through Waxman, made two plea offers that they unquestionably believed to be more than generous. The first required a plea to a felony and a misdemeanor; the second required only a plea to two misdemeanors. Neither required cooperation in the prosecution of anyone else. App. 135-73, 177-78. But Meadows stuck to her constitutional guns and rejected the offers.

That rejection was the final straw for Waxman, who had been the lead prosecutor in the Concrete Playground investigation. The district court erred in ruling that Waxman's role was irrelevant because it was bound to "consider the action of the government as a whole – not necessarily just the actions of the individual prosecutor." App. 179 n.3. Rather, as this Court held in *Safavian*, prosecutors are human and may well have a "personal stake" in the matter and "a motivation to engage in self-vindication." 649 F.3d at 692.

Waxman may not quite fit the role of Inspector Javert, but his extended, contentious history with Meadows goes a long way to explain why he charged her

23

with six felonies for conduct that is rarely prosecuted and routinely addressed administratively.  As this Court held in *Meyer*, a presumption of vindictiveness may be supported by a defendant's "unexpected and burdensome assertions of legal rights . . . ." 810 F.2d at 1247.  The record is plain that Meadows' unrelenting "assertions of legal rights" had exceeded Waxman's tolerance, and the result was a vindictive prosecution.

Finally, if there was any doubt as to Waxman's focus, it was erased by his sentencing memorandum and his argument at sentencing.  He urged the court to impose an 18-month prison sentence because of Meadows' "lies to government officials that goes back years and in virtually every legal context one could think of," her obstruction of justice, and her contraband offenses.  7/16/15 Tr. 16, 17, 20; App. 193-95, 195-97.

### 2.  Erroneous Rationale Based on Chronology

The district court concluded that "defendant's chronology is not sufficient to meet her burden" because the proceeding in which she "exercised . . . her constitutional rights [came] to a close . . . ."  App. 183.  The court further explained that "the government had obtained convictions in those cases [in which she refused to cooperate – the homicide, Concrete Playground, and smuggling contraband to her boyfriend] by the time it offered defendant the opportunity to

24

plead guilty to two misdemeanor offenses and long before it filed formal charges against her." App. 185.

First, as a factual matter, this conclusion is simply contrary to the record. The government told the court at the motions hearing that Concrete Playground and the smuggling contraband cases were "still active" and that the government "may" still charge Meadows. 8/12/14 Tr. 22. Second, this unduly narrow view of the prosecutorial vindictiveness doctrine is erroneous as a matter of law. The district court asserted that this Court's decision in *Maddox v. Elzie*, 238 F.3d 437 (D.C. Cir. 2001), stands for the proposition that the vindictive charges must be "lodged in an effort to chill defendant's exercise of her constitutional rights," *i.e.*, rights that had yet to be exercised. App. 185.

Neither *Maddox* nor any other case so holds. In fact, this Court's decision in *Meyer* could not be clearer on this point: the conduct prohibited is government action "in response to the defendant's **prior** exercise of constitutional or statutory rights." 810 F.2d at 1245 (emphasis added). *See also Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort . . . ."). It is absolutely irrelevant that the government had "obtained convictions" of others in those cases in which Meadows invoked her constitutional rights.

Nor does the *Maddox* decision support the district court's ruling in any way. In *Maddox*, the trial prosecutor met with the parole board in connection with a revocation hearing.  This Court held that the prosecutorial vindictiveness doctrine did not extend to that situation because "[t]he Board, not the trial prosecutor, made the decision to revoke [the defendant's] parole, and that decision is distinct from the concern about 'upping the ante' that underlies the prosecutorial vindictiveness doctrine."  238 F.3d at 447.

The district court's rationale based on the chronology of events is clearly erroneous.

### 3.  Erroneous Conclusion that Meadows Did Not Suffer Disparate Treatment

As in *Meyer*, the disparate treatment of a defendant who exercised a constitutional right is "[p]erhaps the most important of the circumstances peculiar to this case . . . ."  810 F.2d at 1246.  Although the district court acknowledged this fact, it (1) ignored Meadows' unrebutted evidence; and (2) erroneously concluded that *Meyer* did not control.  App. 184-85.

First, the district court attempted to distinguish *Meyer* on the facts:  the *Meyer* defendants were charged with a misdemeanor and then, after insisting on a trial, a felony charge was added.  Meadows did not suffer this particular charging punishment, so *Meyer* is inapposite.  App.  184.  As an initial matter, this simplistic reasoning merely identifies a distinction without a difference.  What matters is

26

prosecutorial punishment for the exercise of a constitutional right, not qualitative and temporal differences between the nature and sequence of the punishments.

Second, the district court relegated to a footnote[9] the most important piece of evidence establishing disparate treatment:  in the four years prior to Meadows' indictment, there were 117 cases in which individuals were accused of fraudulently obtaining unemployment benefits from DOES.  8/12/14 Tr. 7-8.  Of those 117 cases, the DOES Inspector General referred 41 to the U.S. Attorney's Office for prosecution.  The U.S. Attorney's Office declined to prosecute in each of the 41 cases.  App. 116-23.  At the motions hearing, the district court found this evidence "compelling." 8/12/14 Tr. 11.

In its written opinion, the court changed its mind, but for no supportable reason.  The court stated that it "is troubled by the general lack of similar prosecutions, but it notes that prosecutions of unemployment benefits fraud do occur."  App. 186.  The court then stated that Meadows "is not necessarily similarly situated to others who defrauded DOES" for the primary reason that "she was also found to be allegedly involved in smuggling contraband into a correctional facility." *Id.*

There is a serious analytical problem with this holding.  What does it even mean to say, in a prosecution for wrongfully obtaining unemployment benefits,

---

[9] App. 184 n.5.

27

that the defendant "was also found to be allegedly involved in smuggling contraband into a correctional facility"?  Who "found" that this "alleged" conduct occurred?  If this "fact" was part of the prosecutor's decision to charge Meadows with six felonies for wrongfully obtaining unemployment benefits, that, in and of itself, proves prosecutorial vindictiveness.  That is the point of the doctrine:  if a defendant has avoided prosecution for one offense through the exercise of rights, the prosecutor may not punish the defendant by improperly prosecuting another offense.   In essence, the district court has held that the prosecutor believed Meadows to be a bad person, and that it was therefore acceptable for him to subject her to disparate treatment.

The district court made a related finding that is equally flawed:  "the causal link between defendant's alleged protected conduct – refusing to cooperate or plead guilty – and the decision to indict her is very attenuated."  App. 186.  The court offers no support for this finding and there is none in the record.  Indeed, Waxman's own statement to the court at the motions hearing connects the decision to prosecute this case with both Concrete Playground and using false identification to smuggle contraband:  "We can't just walk away from that."  8/12/14 Tr. 22. That statement alone establishes the necessary causal link.

### 4. Erroneous Conclusion that the Government Adduced Sufficient Evidence to Rebut the Presumption

Although the district court concluded that Meadows had not carried her burden in order to create a presumption of vindictiveness, it nevertheless evaluated the government's evidence "because the record includes some evidence of disparate treatment of this defendant . . . ."  App. 187.  The court erroneously concluded that the government adduced evidence that "provide[d] a legitimate, nonvindictive explanation" for the prosecution.  App. 189.

The government's own evidence – as well as the district court's description of it – demonstrates that the six-count felony charging decision was unquestionably bound up with the government's extreme unhappiness with Meadows' refusal to play ball, *i.e.,* to cooperate and plead guilty.  But her refusal to cooperate and plead guilty goes by other names – the Fifth Amendment rights to due process and against self-incrimination, and the Sixth Amendment right to a jury trial.  The U.S. Attorney's Office thought that Meadows is a bad actor who somehow eluded the serious charges of obstruction of justice, bribery, and smuggling contraband.  But when that eluding is simply a product of the exercise of constitutional rights, a prosecution that is in any way based on the uncharged conduct must constitute prosecutorial vindictiveness, or the doctrine is rendered ineffective.

Put another way, the district court seemed to think that a prosecutor's discretion in charging is identical to a trial court's ability to consider uncharged conduct at sentencing. Although there may be some superficial similarity, the prosecutor's discretion is circumscribed by the vindictiveness doctrine. If any aspect of a charging decision implicates the prior exercise of rights by the defendant, the doctrine requires dismissal. It was clear error for the district court to deny Meadows' motion.

## II. THE PROSECUTOR IMPROPERLY REFERENCED THE DISTRICT COURT'S DENIAL OF MEADOWS' MOTION TO DISMISS.

References at trial to preliminary determinations, such as the court denying a motion to dismiss, are improper and prejudicial "because they inject an arbitrary factor into jury deliberations." *State v. Rudd*, 586 S.E.2d 153, 156 (S.C. Ct. App. 2003) (citation and internal quotation marks omitted). "The danger is that a juror might be persuaded to rely on the opinion of others instead of exercising his independent judgment as to the facts." *Id. See also Sailors v. State*, 593 N.E.2d 202, 206-07 (Ind. Ct. App. 1992) (collecting cases) (finding a prosecutor's reference to prior proceedings before a magistrate and a grand jury to be "highly prejudicial" to defendant's right to have jurors exercise their own independent judgment); *Ex parte Tomlin*, 540 So. 2d 668, 669-70 (Ala. 1988) (per curiam) (reversing conviction because prosecutor referenced in his closing argument the fact that the judge allowed the case to go to the jury); *Martin v. Commonwealth*, 75

30

S.W.2d 13, 14 (Ky. Ct. App. 1934) (reversing conviction because prosecutor referenced the trial court's ability to prevent the case from going to the jury if the court determined that the prosecution lacked evidence and reasoning that such statements are "manifestly unfair" because they "lead the jury to believe that the judge believed the defendant to be guilty").

While cross-examining Meadows, the prosecutor asked a number of questions relating to the court's denial of her motion to dismiss.  12/18/14 Tr. 132-33, 146.  These repeated questions were highly prejudicial.  The logical inference for the jury to draw was that the trial judge believed that Meadows was guilty, or at a minimum, believed the government's version of events.   Just like the prosecutor's reference to preliminary determinations in *Rudd*, the prosecutor's reference to the court's denial of Meadows' motion to dismiss created a substantial risk that a juror "might be persuaded to rely on the opinion of others instead of exercising his independent judgment as to the facts."  Thus, this line of questioning by the prosecutor deprived Meadows of her right to a fair trial and, as such, her conviction must be reversed.

The district court's instruction to the jury, 12/18/14 Tr. 164-65, did not eliminate the significant prejudice caused by the questions.  The Supreme Court has long recognized the limitations of a curative jury instruction:

> [T]here are some contexts in which the risk that the jury
> will not, or cannot, follow instructions is so great, and the

31

> consequences of failure so vital to the defendant, that the
> practical and human limitations of the jury system cannot
> be ignored.

*Bruton v. United States*, 391 U.S. 123, 135 (1968). Similarly, this Court has found

it to be "particularly unrealistic" in some situations "to expect effective execution

of the 'mental gymnastic' required by limiting instructions . . . ." *United States v.*

*Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985) (quoting *Nash v. United States*, 54

F.2d 1006, 1007 (2d Cir. 1932) (L. Hand, J.)). In those situations, "'the naive

assumption that prejudicial effects can be overcome by instructions to jury'

becomes more clearly than ever 'unmitigated fiction.'" *Id.* (quoting *Krulewitch v.*

*United States*, 336 U.S. 440, 453 (1949) (Jackson, J. concurring)).

The district court's jury instruction did not ameliorate the unfair prejudice

caused by the government's repeated reference to the district court denying

Meadows' motion to dismiss. More than 80 years ago, the Supreme Court

characterized the role of the federal prosecutor in language that has particular

applicability to this case:

> [The federal prosecutor] is in a peculiar and very definite
> sense the servant of the law, the twofold aim of which is
> that guilt shall not escape or innocence suffer. He may
> prosecute with earnestness and vigor – indeed, he should
> do so. But, while he may strike hard blows, he is not at
> liberty to strike foul ones. It is as much his duty to
> refrain from improper methods calculated to produce a
> wrongful conviction as it is to use every legitimate means
> to bring about a just one.

32

> **It is fair to say that the average jury, in a greater or lesser degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions [and] insinuations . . . are apt to carry much weight against the accused when they should properly carry none.**

*Berger v. United States*, 295 U.S. 78, 88 (1935) (emphasis added).

The prosecutor's repeated reference to the district court's denial of Meadows' motion to dismiss was just such an "improper suggestion" and an "insinuation" that the district court believed Meadows to be guilty. Meadows' convictions must be reversed for this reason alone.

## III. BY ARGUING THAT MEADOWS' DEFENSE HAD A "ONE IN NEARLY 60 MILLION" CHANCE OF BEING TRUE, THE PROSECUTOR MADE AN IMPROPER CLOSING ARGUMENT THAT PREJUDICED MEADOWS AND AFFECTED THE TRIAL'S OUTCOME.

It is axiomatic that a prosecutor may not, in closing argument, refer to or rely on facts not admitted into evidence. *E.g.*, *United States v. Maddox*, 156 F.3d 1280, 1282 (D.C. Cir. 1998) (collecting cases). Nor may a prosecutor make an argument that would confuse the jury regarding the government's burden of proof. *See United States v. Sawyer*, 443 F.2d 712, 713-14 (D.C. Cir. 1971) (district court should exclude "those statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury"). The government's closing argument below violated both of these principles. One portion of the argument was based on statistical probability and was improper for

33

three separate reasons. First, the argument assumed facts not in evidence, namely, that there had been no other computer glitches or errors with respect to the other questions posed to applicants seeking unemployment benefits. Second, the argument was not supported by any expert testimony regarding the statistics utilized. Third, the argument equated proof beyond reasonable doubt to a numerical percentage of probability of guilt. Each of these errors prejudiced Meadows and affected the outcome of the trial.[10]

### A. The Government's "One in Nearly 60 Million" Closing Argument Contained Three Separate Errors.

Each party presented a closing argument that was mirror image of the other. The government's closing argument focused on deception. *See, e.g.*, 12/22/14 Tr. 33 ("When this case first began, the government told you that this case was about one thing, deception. All of the evidence you have seen and the testimony you have heard thus far has proven exactly that."). The government argued that Meadows intentionally submitted false information 49 separate times in order to wrongfully obtain unemployment benefits: "Ms. Meadows would have you believe that not once, not twice, but all 49 times she did this somehow, mysteriously, magically, due to some computer glitch, some computer error for which there's zero evidence whatsoever, her answers were changed." *Id.* at 36.

---

[10] The defense made no objection to this argument, and this Court therefore reviews for plain error. *United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998).

The government's entire case, at bottom, was the assertion that on 49 separate occasions, Meadows clicked "no" in response to the following question: "Did you perform work during the week claimed?" *Id.* at 35.

Defense counsel's closing argument struck the opposite theme – mistake: "As I said from the beginning, there was no crime here. There was a mistake, and it wasn't Ms. Meadows' mistake." *Id.* at 49. Meadows' defense was that she actually answered "yes," rather than "no," to the question "Did you perform work during the week claimed" and then the government mistakenly paid her unemployment benefits. *Id.* at 71 ("Ms. Meadows here didn't steal anything. There was no intent to defraud. And that's what this goes to. She never intended to take benefits she wasn't entitled to . . . .").

In the government's rebuttal argument, the prosecutor contrasted these two competing narratives by making the following probability argument:

> There are six questions on here, . . . entry points for data, key strokes that she had to do. And what did she tell you? She didn't get any of these wrong with regards to 1, 3, 5, 6 or the others, just number 2.

> So when you want to figure out how many data entry points there are during that 49-week period that go to the Department of Employment Services, you have nearly 6 million data entry points that go. And yet this magical, mysterious computer glitch found. Ms. Meadows, one in 6 million, and changed which question?

> The only question that happens to matter in this case, right? Not 3, not 4, not the severance, not these other

questions. Of course, the only one that matters. Is that believable in any way? Is that reality? That's not the way the world works. One in 6 million and it happened to affect her?

But it's even more than that when you think about it because it's not just the six questions, there are other data entry points on this document, right? Won't put it up there. But her name, her Social Security number, the week-ending claim date, the e-mail address, all things that she had to enter from her computer because, of course, this is a computer glitch.

So, in theory, any one of these other data entry points could have gotten affected by this computer magical, mysterious computer glitch. So when you look at that, what you have is that ten different fields that are at issue. You're up close to one in 10 million. And I know this is getting somewhat towards the extreme or the absurd, but I think that's what makes the point.

Finally, on this particular point, each one of these key strokes, her name has whatever it has, 13 key strokes. So the Social Security number, nine key strokes. Any one of those could have been affected. I've counted them up.

There are actually 61 key strokes that Ms. Meadows had to make as she sits at her computer entering her name, the Social Security number, the week ending days, her e-mail address, plus the six questions, and what's left is this number at the bottom. One in nearly 60 million that this computer glitch found its way to Ms. Meadows and changed question 2 from yes, I'm working and this is how much, to no, I'm not.

I speak broadly because it is in the extreme, it is absurd, because it's just not reality. No computer glitch that any of us have ever heard of would work in this method. So no evidence, and the odds are astronomical that this could ever have taken place.

*Id.* at 80-81.

Thus, in a case that boiled down to two competing explanations for why Meadows received unemployment benefits, the government, in its final argument to the jury, asserted that the odds that Meadows' version of events was correct was "one in nearly 60 million" and that "the odds are astronomical that this could ever have taken place."  *Id.* at 81.

This closing argument is substantively similar to the closing argument at issue in *Commonwealth v. Ferreira*, 955 N.E.2d 898 (Mass. 2011).  In *Ferreira*, the Commonwealth charged the defendant with robbery, relying in part on the victim's identification of the defendant and another individual that participated in the robbery.  *Id.* at 900-01.  The victim identified the defendant as the perpetrator from an array of six photographs.  *Id.* at 901.  The victim then identified the other individual allegedly involved from an array of six different photographs of individuals whom the defendant allegedly knew.  *Id.*  In making these identifications, the victim was also given the option of selecting "none of the above" when reviewing the six photographs; therefore, the victim had seven options for each identification.  *Id.* at 902.  The prosecutor made the following closing argument:

> He's shown six photos in the first array, six photos in the second array.  Well, we also heard that there was a seventh option in each array.  That was none of the above.  An option [the victim] had, an option he didn't take.  So now you have two arrays with each seven options. . . .

37

> Now, let's think about this for a moment. Seven on the left, seven on the right. How many different combinations does that make? By my math, it's forty-nine. . . . The odds of picking two men out of two arrays with forty-nine different combinations who are that type, one out of forty-nine. Two per cent. Two per cent. What are the odds that [the victim] would have picked two different people, some other combination? Ninety-eight percent. Do you call that coincidence? I call that proof beyond a reasonable doubt.

*Id.*

The Massachusetts Supreme Judicial Court reversed the conviction, finding this closing argument to be "fundamentally flawed" and thereby created a "substantial risk of a miscarriage of justice." *Id.* at 900, 903-904. The court found numerous problems with the closing, including: (1) implicit in the probability argument were facts and assumptions that had not been admitted into evidence; for example, that the second array of photographs were all individuals whom the defendant knew, *id.* at 903; (2) the probability analysis was never offered through expert testimony, *id.*; and (3) by equating proof beyond a reasonable doubt with a numerical percentage, the prosecution's argument "carried the aura of mathematical simplicity and precision – that the determination of guilt was as simple and inexorable as multiplying 1/7 by 1/7." *Id.* at 904.

Each of these "fundamental flaws" is also present here.

## 1.  The Probability Argument Assumed Facts Not in Evidence.

In order for the government's "one in nearly 60 million" probability argument to be correct, there are at least three facts not in evidence that must be assumed to be true.  First, it must be assumed that during the 49-week period in question, DOES received "nearly 6 million data entry points."  12/22/14 Tr. 80.  The record does not disclose where the prosecutor obtained this number, and there were no facts admitted into evidence that established it.

Second, it must be assumed that all "data points . . . that [went] to [DOES]" during the 49-week period in question were correctly transmitted.  Thus, the only way the number "one" is correct in the government's argument is if it is assumed that every other data point transmitted by every other applicant during those 49 weeks was transmitted successfully.  The government never proved this fact.  To the contrary, the government's own witnesses testified at the time when Meadows submitted her claims, there was no tracking system for calls into the call center, 12/17/14 Tr. 154, and records of any computer problems were destroyed after three years.  *Id.* at 175.  Thus, there was no evidence regarding whether there were any problems with the relevant computer systems at the time of Meadows' claims.

The third implicit assumption in the government's argument is that any other type of problem with regards to transmitting a claimant's information would result in some type of audit, investigation, or prosecution sufficient to bring it to

39

management's attention.  For example, the argument arrives at the "one in nearly 60 million" figure by including the data entry points for a claimant's name and social security number.  12/22/14 Tr. 80.  But one could imagine a systemic problem where, for example, every time a claimant enters the letter "b" in his/her name, the system transmits that entry point as the letter "d."  Despite this problem, claims would still be properly paid, the entire system would pass any financial audit, and there would be no investigations or prosecutions for overpayments.  Yet it would not be true to say that every other data entry point in the system was being correctly transmitted.

The government's "one in nearly 60 million" probability argument conceals these implicit assumptions.  As the *Ferreira* court recognized, "[t]he apparent simplicity of the mathematics belies the complexity of the conclusion regarding the probability of an accurate identification, and conceals the assumptions implicit in the conclusion."  955 N.E.2d at 902-03.  The same is true here.  The jury was never informed that the government's "one in nearly 60 million" probabilities depended on facts not admitted into evidence, and it is unreasonable to think that a jury could have parsed the logic and identified these assumptions.  The *Ferreira* court's conclusion applies here as well:  "For this reason alone, the prosecutor's probability analysis is false and misleading.  And without the implicit [factual]

40

assumption[s], . . . the probability analysis, at a minimum, becomes far more complex." *Id.* at 903.

### 2. The Probability Argument Relied on Statistical Probabilities that Were Never Offered Through Expert Testimony.

The second fundamental flaw in the government's "one in nearly 60 million" probability argument was that the statistical analysis was not offered through expert testimony. As the *Ferreira* court explained:

> [W]here the Commonwealth seeks to provide the jury with an analysis of mathematical probability, . . . the analysis must be offered through expert testimony, not the prosecutor's closing argument. . . . If the prosecutor had offered this opinion to the jury through the testimony of an expert witness, the defendant could have challenged the admissibility of the expert opinion under *Daubert*[11]
> . . . .

955 N.E.2d at 903-04 (citations omitted). *See also Tagatz v. Marquette Univ.*, 681 F. Supp. 1344, 1351 (E.D. Wis. 1988) (striking references to treatises in party's closing argument because they were not admitted through an expert witness).

No expert witnesses testified for the government. Moreover, none of the government's fact witnesses, including the Director of DOES and one of its software engineers, gave testimony related to probabilities or the statistical accuracy of the "one in nearly 60 million" argument.

---

[11] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 585-95 (1993).

Thus, Meadows was deprived of the right to challenge the admissibility of this testimony through a *Daubert* motion, she was deprived of the right to cross-examine any expert who may have offered such a statistical analysis, and she was deprived of the right to present her own expert who may have rebutted this statistical analysis. The government's closing argument, when combined with Meadows' complete lack of any opportunity to challenge it, prejudiced her rights and affected the trial's outcome.

### 3. The Probability Argument Erroneously Equated Proof Beyond Reasonable Doubt with a Numerical Probability of Guilt.

Finally, even if the government had relied solely on facts admitted into evidence, and even if the government had presented through expert testimony, the argument would still be misleading to the jury because it would redefine "proof beyond a reasonable doubt." The *Ferreira* court relied on an article by Laurence Tribe that is equally applicable here:

> "[T]he very mystery that surrounds mathematical arguments – the relative obscurity that makes them at once impenetrable by the layman and impressive to him – creates a continuing risk that he will give such arguments a credence they may not deserve and a weight they cannot logically claim."

955 N.E.2d at 904 (quoting Laurence H. Tribe, *Trial By Mathematics: Precision and Ritual in the Legal Process*, 84 Harv. L. Rev. 1329, 1334 (1971)).

The *Ferreira* court rejected the position that a concept like reasonable doubt is "susceptible to quantification." Rather, "it is inherently qualitative." 955 N.E.2d at 904 (citation and internal quotation marks omitted). Other courts have applied this principle in related contexts. The Fifth Circuit rejected a statistical probability argument and discussed "the well-known blue bus hypothetical" as an example of why the judicial system strives for more than simply a high probability of accuracy. *Krim v. pcOrder.com Inc.*, 402 F.3d 489, 497 n.40 (5th Cir. 2005). The U.S. Navy-Marine Corps Court of Criminal Appeals held that it was reversible error to admit expert testimony that attempted to quantify the likelihood that a victim was being truthful, an error that was compounded by the prosecutor's "closing argument, in which he repeatedly urged the members to make use of that impermissible evidence to judge the credibility of the victim . . . ." *United States v. McGinnis*, 2007 WL 1725687, at *6, 8 (N-M. Ct. Crim. App. 2007). The court reasoned that the defendant "had the substantial right to have the members decide the ultimate issue . . . without the members viewing the victim's credibility through the filter of an expert's view of the victim's credibility. In this case, admitting the expert testimony quantifying the victim's credibility was plain error." *Id.* at *8 (citations, internal quotation marks, and alteration omitted).

It was likewise plain error for the district court to permit the jury to hear – and likely be swayed by – the government's "one in nearly 60 million" argument.

This argument transformed the inherently qualitative reasonable doubt standard into a quantitative standard. This quantification improperly influenced the jury, interfered with the jury's role as the ultimate fact-finder, and requires reversal of the convictions.

### B. Each of These Errors Prejudiced Meadows and Affected the Trial's Outcome.

If the government's closing argument was flawed, this Court then determines "whether improper remarks by the prosecutor sufficiently prejudice[d] a defendant so as to warrant reversal" by applying three factors: (1) "the centrality of the issue affected by the error"; (2) "the closeness of the case"; and (3) "the steps taken to mitigate the error's effects." *United States v. Becton,* 601 F.3d 588, 598 (D.C. Cir. 2010).

In this case, all three factors demonstrate that the government's closing argument was highly prejudicial and requires reversal. The first factor, the centrality of the issue, could not be more critical here, for the issue – whether Meadows acted with the requisite intent – was the sole issue in the case. Meadows did not dispute any other element of the crime: she admitted that she submitted the unemployment claims, that she did so across state lines, and that she did so while employed. *See*, *e.g.*, 12/18/14 Tr. 89-91, 93. Thus, intent is the very issue that the government's "one in nearly 60 million" closing argument goes to; the flawed closing argument could not be any more central to the outcome of this case.

The second factor, the closeness of the case, also supports reversal.  Defense counsel's closing argument walked through the contradictory and ambiguous documentary evidence provided by the government and challenged the credibility of the government's witnesses.  12/22/14 Tr. 50, 52.  Meadows testified that she did not intend to submit false information when submitting her claims and supported her testimony with documentary evidence.  *See*, *e.g.*, *id.* at 67-68; 12/18/14 Tr. 101.  In contrast, the government presented data supporting its argument that Meadows submitted false information on 49 separate occasions and that it would have been unheard of for any type of computer error to allow Meadows to receive unemployment payments she was not entitled to on 49 separate occasions. *See*, *e.g.*, 12/22/14 Tr. 44-45, 47.

Thus, the jury's decision came down to a credibility assessment.  They were faced with two competing narratives: the government's deception narrative and Meadows' mistake narrative.  There were documents and witness testimony that supported both.  In such a situation, it was a close call for the jury.  For the government to unfairly tip the scales by arguing that Meadows' narrative had a "one in nearly 60 million" probability of being correct plainly affected the outcome of the trial.

Finally, the only mitigation step that the trial court can be said to have taken was the general jury instruction that "statements and arguments of the lawyers are

not evidence." *Id.* at 104. This general jury instruction, standing alone, is insufficient. Even if an instruction could have cured the problem, it would have to have been far more specific.

Thus, all three factors demonstrate that the government's fundamentally-flawed closing argument was highly prejudicial to Meadows and affected the outcome of the trial. Her convictions should be reversed.

## CONCLUSION

The district court erred in concluding that the indictment was not the product of vindictive prosecution, and this Court should reverse Meadows' convictions and dismiss the charges with prejudice.

As for the government's improper reference to the denial of the motion to dismiss and its improper closing argument, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). "The government bears the burden of proving the absence of such an effect." *United States v. Linares*, 367 F.3d 941, 952 (D.C. Cir. 2004). The government cannot do so, and the Court should reverse the convictions for this reason as well.

Respectfully submitted,

 /s/ Charles B. Wayne
Charles B. Wayne
Jerald R. Hess
DLA PIPER LLP (US)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com
j.hess@dlapiper.com

*Counsel for Appellant*
*(Appointed by this Court)*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief, submitted under Fed. R. App. P. 32(a)(7)(B), complies with the type-volume limitation and contains 10,622 words.

/s/ Charles B. Wayne

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of July, 2016, I will electronically file the Brief for Appellant and the Appendix for Appellant with the Clerk of Court using the CM/ECF system, which will then send notification of such filing (NEF) to opposing counsel.  I also certify that I will cause two copies of the Brief for Appellant and one copy of the Appendix for Appellant to be served by hand on Elizabeth Trosman, Office of the United States Attorney, 555 4th Street, N.W., Washington, D.C. 20001.

/s/ Charles B. Wayne

# ADDENDUM

## United States Code

18 U.S.C.

§ 641 .................................................................................... A-2

§ 1343 .................................................................................. A-3

## D.C. Code

§ 22-3211 ............................................................................ A-4

§ 22-3212 ............................................................................ A-5

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 31. Embezzlement and Theft (Refs & Annos)

---

18 U.S.C.A. § 641

§ 641. Public money, property or records

Effective: July 15, 2004
Currentness

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted--

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

**CREDIT(S)**
    (June 25, 1948, c. 645, 62 Stat. 725; Pub.L. 103-322, Title XXXIII, § 330016(1)(H), (L), Sept. 13, 1994, 108 Stat. 2147; Pub.L. 104-294, Title VI, § 606(a), Oct. 11, 1996, 110 Stat. 3511; Pub.L. 108-275, § 4, July 15, 2004, 118 Stat. 833.)

18 U.S.C.A. § 641, 18 USCA § 641
Current through P.L. 114-181. Also includes P.L. 114-183.

---

End of Document                                     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**A-2**

---

United States Code Annotated
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
         Chapter 63. Mail Fraud and Other Fraud Offenses (Refs & Annos)

18 U.S.C.A. § 1343

§ 1343. Fraud by wire, radio, or television

Effective: January 7, 2008
Currentness

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**CREDIT(S)**

   (Added July 16, 1952, c. 879, § 18(a), 66 Stat. 722; amended July 11, 1956, c. 561, 70 Stat. 523; Pub.L. 101-73, Title IX, § 961(j), Aug. 9, 1989, 103 Stat. 500; Pub.L. 101-647, Title XXV, § 2504(i), Nov. 29, 1990, 104 Stat. 4861; Pub.L. 103-322, Title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 2147; Pub.L. 107-204, Title IX, § 903(b), July 30, 2002, 116 Stat. 805; Pub.L. 110-179, § 3, Jan. 7, 2008, 121 Stat. 2557.)

18 U.S.C.A. § 1343, 18 USCA § 1343
Current through P.L. 114-181. Also includes P.L. 114-183.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**A-3**

West's District of Columbia Code Annotated 2001 Edition
  Division IV. Criminal Law and Procedure and Prisoners.
    Title 22. Criminal Offenses and Penalties. (Refs & Annos)
      Subtitle I. Criminal Offenses.
        Chapter 32. Theft; Fraud; Stolen Property; Forgery; and Extortion.
          Subchapter II. Theft; Related Offenses. (Refs & Annos)

DC ST § 22-3211
Formerly cited as DC ST 1981 § 22-3811

§ 22-3211. Theft.

Currentness

(a) For the purpose of this section, the term "wrongfully obtains or uses" means: (1) taking or exercising control over property; (2) making an unauthorized use, disposition, or transfer of an interest in or possession of property; or (3) obtaining property by trick, false pretense, false token, tampering, or deception. The term "wrongfully obtains or uses" includes conduct previously known as larceny, larceny by trick, larceny by trust, embezzlement, and false pretenses.

(b) A person commits the offense of theft if that person wrongfully obtains or uses the property of another with intent:

(1) To deprive the other of a right to the property or a benefit of the property; or

(2) To appropriate the property to his or her own use or to the use of a third person.

(c) In cases in which the theft of property is in the form of services, proof that a person obtained services that he or she knew or had reason to believe were available to him or her only for compensation and that he or she departed from the place where the services were obtained knowing or having reason to believe that no payment had been made for the services rendered in circumstances where payment is ordinarily made immediately upon the rendering of the services or prior to departure from the place where the services are obtained, shall be prima facie evidence that the person had committed the offense of theft.

**Credits**
(Dec. 1, 1982, D.C. Law 4-164, § 111, 29 DCR 3976.)

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2016 Thomson Reuters
DC CODE § 22-3211
Current through June 21, 2016

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.                                    1

West's District of Columbia Code Annotated 2001 Edition
   Division IV. Criminal Law and Procedure and Prisoners.
      Title 22. Criminal Offenses and Penalties. (Refs & Annos)
         Subtitle I. Criminal Offenses.
            Chapter 32. Theft; Fraud; Stolen Property; Forgery; and Extortion.
               Subchapter II. Theft; Related Offenses. (Refs & Annos)

DC ST § 22-3212
Formerly cited as DC ST 1981 § 22-3812

§ 22-3212. Penalties for theft.

Effective: June 11, 2013
Currentness

(a) *Theft in the first degree.* -- Any person convicted of theft in the first degree shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 10 years, or both, if the value of the property obtained or used is $1,000 or more.

(b) *Theft in the second degree.* -- Any person convicted of theft in the second degree shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 180 days, or both, if the property obtained or used has some value.

(c) A person convicted of theft in the first or second degree who has 2 or more prior convictions for theft, not committed on the same occasion, shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 10 years and for a mandatory-minimum term of not less than one year, or both. A person sentenced under this subsection shall not be released from prison, granted probation, or granted suspension of sentence, prior to serving the mandatory-minimum.

(d) For the purposes of this section, a person shall be considered as having 2 or more prior convictions for theft if he or she has been convicted on at least 2 occasions of violations of:

(1) § 22-3211;

(2) A statute in one or more jurisdictions prohibiting theft or larceny; or

(3) Conduct that would constitute a violation of § 22-3211 if committed in the District of Columbia.

**Credits**
(Dec. 1, 1982, D.C. Law 4-164, § 112, 29 DCR 3976; Aug. 20, 1994, D.C. Law 10-151, § 113(a), 41 DCR 2608; June 3, 1997, D.C. Law 11-275, § 12(b), 44 DCR 1408; Dec. 10, 2009, D.C. Law 18-88, § 214(d), 56 DCR 7413; June 11, 2013, D.C. Law 19-317, § 205(a), 60 DCR 2064.)